ORIGINAL

FILED IN CHAMBERS
U.S.D.C. Atlanta

SEP 1 2010

JAMES N. HATTEN, Clerk
By: [signature]
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

UNITED STATES OF AMERICA :

v. : CRIMINAL ACTION NO. 1:10-CR-375

ALLERGAN, INC.,

Defendant.

**INFORMATION**

**THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF GEORGIA CHARGES THAT:**

At all times relevant to this Criminal Information:

**COUNT ONE**

(Distribution of a Misbranded Drug/Biologic)
21 U.S.C. §§ 331(a) and 352(f)(1)

1. From on or about January 01, 2000, through on or about December 31, 2005, in the Northern District of Georgia and elsewhere, defendant,

**ALLERGAN, INC.,**

the producer and manufacturer of BOTOX, a prescription biological product containing botulinum toxin type A, a purified neurotoxin, introduced into interstate commerce, and caused to be introduced into interstate commerce, quantities of BOTOX, a drug and biologic within the meaning of 21 U.S.C. § 321(g)(1) and 42 U.S.C. § 262(i), which was misbranded under 21 U.S.C. § 352(f)(1), in that this drug and biologic lacked adequate directions for its use, because the defendant **ALLERGAN, INC.**, marketed and promoted the drug and biologic for uses that were outside its labeling, to wit, off-label uses specifically for the treatment of headache, pain, spasticity, and juvenile cerebral palsy, and these off-label uses had not been approved by the Food and Drug Administration.

**The Defendant**

2. Defendant **ALLERGAN, INC.** (hereinafter referred to as "**ALLERGAN**"), is a global corporation formed under the laws of the state of Delaware, with its principal executive offices at 2525 Dupont Drive, Irvine, California 92612. **ALLERGAN** specializes in manufacturing and marketing specialty pharmaceuticals (primarily eye care, skin care, and neuromodulators) and medical devices (primarily breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on facial wrinkles).

**BOTOX**

3. **ALLERGAN** and its wholly-owned subsidiaries produce and manufacture a prescription pharmaceutical formulation of botulinum toxin type A, a purified neurotoxin to which it received the rights in 1991 from Oculinum, Inc., the drug's developer. **ALLERGAN** markets and sells the toxin in the United States for therapeutic use under the brand name: "BOTOX".

4. During the relevant time period, one vial of BOTOX cost approximately $400 to $500 for 100 units, and treatment of most off-label uses of BOTOX required injections of anywhere between 100 to 400 units or more. Since BOTOX's effect on a muscle wears off over time, patients get re-injected at periodic intervals, generally every three months. BOTOX is a "buy and bill" drug, meaning that doctors purchase BOTOX directly from **ALLERGAN** and assume the risk that they will get reimbursed on the back end by a

healthcare payer after submitting the claim. Consequently, doctors would not inject BOTOX for off-label uses if they could not get reimbursed.

**BOTOX's Limited FDA Approval**

5. BOTOX has limited approval and licensing by the Food and Drug Administration ("FDA") as a biological product and drug. Although perhaps best known for its use in connection with cosmetic facial aesthetics, the FDA first approved BOTOX for the treatment of certain neuromuscular disorders.

6. In 1989, the FDA approved **ALLERGAN**'s Biological License Application ("BLA") to distribute and market BOTOX (botulinum toxin type A) in interstate commerce for the treatment of strabismus (crossed-eyes) and blepharospasm (involuntary eyelid muscle contractions) associated with dystonia. Thereafter, in December 2000, FDA approved **ALLERGAN**'s supplemental BLAs ("sBLAs") to distribute and market BOTOX in interstate commerce for the treatment of cervical dystonia (involuntary neck muscle contractions) in adults, to decrease the severity of abnormal head position and neck pain associated with cervical dystonia, and in July 2004, to treat severe primary axillary hyperhidrosis (excess sweating) that is inadequately managed with topical agents.

**THE FOOD DRUG AND COSMETICS ACT (21 U.S.C. §§ 301 - 397) & PUBLIC HEALTH SERVICE ACT (42 U.S.C. §§ 262 et seq.)**

7. Under the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-397, and the Public Health Services Act ("PHSA"), 42 U.S.C. § 262 et seq., the FDA is charged with, *inter alia*, ensuring that drugs and biological products are reasonably safe and effective as well as properly labeled.

8. BOTOX qualifies as a "drug" under the FDCA because it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" and "intended to affect the structure or function of the body of man." 21 U.S.C. § 321(g)(1). In addition, BOTOX qualifies as a "biological product" under the PHSA because it is a "toxin...applicable to the prevention, treatment or cure of a disease or condition of human beings." 42 U.S.C. § 262(i); *see also* 21 C.F.R. § 600.3(h) (defining "[b]iological product" as "any ... toxin ... or analogous product applicable to the prevention, treatment or cure of disease or injuries of man"). As a biologic that was shipped in interstate commerce, defendant **ALLERGAN** was required to obtain a biological license for each of intended uses of BOTOX, *see* 42 U.S.C. § 262, and otherwise must comply with all other federal prescription drug regulations, *see* 42 U.S.C. § 262.

9. Biological products ("biologics"), such as BOTOX, are drugs derived from living material, rather than chemical synthesis. In light of additional manufacturing, storage, and safety issues raised by biologics, they undergo a different FDA approval process than other drugs and are issued a "biologics license," when they are approved. Other than the initial licensing process, all drug regulations in the FDCA apply to biologics with equal force and effect. *See* 42 U.S.C. § 262.

10. No biological products may be introduced into, or distributed through, interstate commerce unless the sponsor of the product obtains a biologics license and properly labels the product. 42 U.S.C. § 262(a)(1). To obtain a biologics license, the sponsor must submit a BLA to the FDA, 21 C.F.R. §601.2, providing evidence that the biologic is "safe, pure, and potent," 42 U.S.C. § 262(a)(2)(C)(i)(I), which means that the product has been proven effective for a specific use "by appropriate laboratory tests or by adequately controlled clinical data." 21 C.F.R. § 600.3(s). The FDA approves new biologics based on an evaluation of the products' safety and efficacy demonstrated by randomized, prospective, and double-blind clinical trials. 21 C.F.R. § 601; FDA Release "Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products," May 1998.

11. The indication and dosages approved by the FDA are set forth in the biologics' labeling, the content of which is also

reviewed by the FDA as part of the BLA process. *See, e.g.*, 21 C.F.R. §§ 600.3(dd); 601.2(b); 601.12. The label must also reveal all medically relevant information regarding the appropriate use of the biologic, such as dosage, directions for administration, known precautions, warnings, and contraindications. *Id.*

**FDA Prohibition on Off-Label Marketing**

12. Once a drug is approved for a particular use the FDA does not prevent doctors from prescribing the drug for uses that are different than those approved by the FDA. Allowing off-label prescriptions coincides with the FDA's mission to regulate the pharmaceutical industry without directly regulating the practice of medicine.

13. The FDCA, at 21 U.S.C. § 352(f)(1), provides that a drug is misbranded if, among other things, the labeling does not contain "adequate directions for use." As the phrase is used in the FDCA, "adequate directions for use" cannot be written for medical indications or uses for which the drug had not been proven to be safe and effective, through well-controlled clinical studies. Any uses for a drug that are not approved by FDA as safe and effective, and thus that are not included in the drug's approved labeling, are known as "off-label" indications or uses. A drug that does not contain adequate directions for all intended uses because such uses are not included in the FDA-approved labeling for the drug is, therefore, misbranded under section 352(f)(1).

**ALLERGAN Was Prohibited from**
**Marketing BOTOX for Off-Label Uses**

14. **ALLERGAN** was aware of the prohibitions on promoting and marketing a drug or biologic in interstate commerce for off-label uses. On June 21, 2002, **ALLERGAN** distributed to all sales and marketing personnel the PhRMA Code on Interaction with Healthcare Professionals and the "ALLERGAN Field Reference Guide." The ALLERGAN Field Reference Guide emphasized that

> you may not promote any Company product for uses that are not addressed in the approved product labeling or insert.... This promotional ban applies not only to sales calls, but to all marketing efforts such as product launches, sales meetings and activities of third-parties controlled by ALLERGAN.

15. **ALLERGAN's** SEC Form 10-K annual report to shareholders for the calendar year ending December 31, 2004, acknowledges that:

> Physicians may prescribe pharmaceutical and biologic products, and utilize medical device products for uses that are not described in a product's labeling or differ from those tested by us and approved by the FDA. While such "off-label" uses are common and the FDA does not regulate a physician's choice of treatment, the FDA does restrict a manufacturer's communications on the subject of off-label use. Companies cannot actively promote FDA-approved pharmaceutical, biologic or medical device products for off-label uses, but they may disseminate to physicians articles published in peer reviewed journals.... If, however, our promotional activities fail to comply with the FDA's ... regulations or guidelines, we may be subject to warnings from, or enforcement action by, the FDA or another enforcement agency.

16. At all times relevant to this Information, the four conditions that BOTOX had been approved to treat were relatively rare in comparison to the off-label conditions that **ALLERGAN** actively promoted it to treat (*e.g.*, headache, pain, spasticity including juvenile cerebral palsy). For example, with respect to cervical dystonia ("CD"), **ALLERGAN's** 2003 BOTOX Foundation Training Materials estimated that in the United States the prevalence of CD was slightly less than 9 people out of 100,000 (0.0009%), which would correlate to approximately 27,000 Americans who had the condition in a population of approximately 300 million.

**ALLERGAN'S OFF-LABEL MARKETING PRACTICES**

17. Since as early as its 1997-2001 Strategic Plan, **ALLERGAN** made it a top corporate priority to maximize sales of BOTOX for spasticity, migraine headache and pain, none of which were approved by the FDA. Many of **ALLERGAN's** yearly Strategic Plans forecast that BOTOX's on-label sales would shrink and that all incremental growth would come from off-label sales.

18. **ALLERGAN's** off-label marketing efforts included sales calls by **ALLERGAN** sales representatives ("BMCs," or BOTOX Medical Consultants, then later called "NMCs," Neurotoxin Medical Consultants) on physicians who would not typically treat patients who had any of the four FDA-approved conditions.

19. **ALLERGAN** instructed its sales representatives to promote BOTOX for pain and headache - even when its own clinical studies showed limited support for these uses.

20. **ALLERGAN** exploited its Cervical Dystonia ("CD") indication to grow headache and pain sales. In 2003, **ALLERGAN** developed the "CD/HA Initiative" as a "rescue strategy" in the event of negative results of clinical trials, and a backup strategy to ensure continued expansion into the headache market.

21. As part of this initiative, **ALLERGAN** asked the FDA to expand the BOTOX label to include treatment of headache associated with CD and the treatment of "pain" - not merely "neck pain" - associated with CD. The FDA refused the headache request, and, during the relevant time period of this Criminal Information, the FDA had not yet denied the pain request. Undeterred by the poor clinical trial results and FDA's unwillingness to expand the BOTOX label to include headache associated with CD without further evidence of efficacy, **ALLERGAN** continued to market and promote BOTOX for headache and pain by claiming that CD was misdiagnosed or underdiagnosed. In an email, an **ALLERGAN** executive states: "It's too bad that there is no easy way to obtain 'headache' in our label (even as part of CD). . . . Has the US Marketing group exploited the notion of much higher prevalence of CD in the population?"

22. Soon thereafter, **ALLERGAN** launched a new BOTOX marketing campaign premised on the idea that CD is "underdiagnosed" and

"misdiagnosed" and to move toward emphasizing symptoms of mild/moderate CD (*i.e.*, Headache, Pain instead of severe CD). **ALLERGAN's** "key messages" for the campaign emphasized that doctors could diagnose CD based on headache and pain symptoms, even when a doctor "doesn't see any cervical dystonia."

23. **ALLERGAN's** new CD campaign marketing worked. **ALLERGAN** listed the "CD expansion campaign" as one of the "key drivers" for BOTOX sales.

24. **ALLERGAN** also leveraged other companies' relationships with doctors in off-label specialties by entering into "co-promotion" agreements. In 2002, **ALLERGAN** agreed to sell a medical device manufacturer's device to doctors who treated spasticity, thereby giving **ALLERGAN** sales people opportunities to discuss BOTOX as an adjunctive therapy for spasticity and pain, uses which were not approved by FDA.

**ALLERGAN's Used a Variety of Tactics to Carry Out Its Unlawful, Off-Label Marketing Strategy**

25. **ALLERGAN** used a variety of tactics to carry out its illegal off-label marketing strategy including providing "value-added" reimbursement support services, lobbying healthcare payers to expand coverage for off-label uses, funding and controlling continuing medical education programs on off-label uses, paying doctors to attend Advisory Boards on off-label uses, promotional dinners to tout BOTOX's efficacy for off-label uses,

and creating and funding organizations to promote off-label uses of BOTOX. For most of the relevant time period, BOTOX "Customer Team Units," or "CTUs," coordinated sales initiatives among numerous different departments, including its sales/marketing, medical affairs (purportedly independent scientific advisors), and reimbursement divisions which permitted more focused communication of its off-label marketing messages.

**A. ALLERGAN Provided "Value-Added" Reimbursement Support Services to Grow Off-Label Sales.**

26. **ALLERGAN** recognized that the "biggest obstacle" to growing BOTOX sales was the lack of reimbursement for off-label uses. Even though government and private healthcare payers covered BOTOX for every FDA-approved indication, **ALLERGAN** doubled the size of its reimbursement support team in 2003 to "minimize customer barriers" for the use of BOTOX for headache, pain and spasticity.

27. The BOTOX reimbursement team was an extension of the sales force, and its express goal was to improve injector economics by selling more BOTOX. The pitch for the BOTOX reimbursement programs - collectively referred to as the "BOTOX Advantage Program" - was: "Improving the Reimbursement Environment for Today and For the Future by Providing Comprehensive Reimbursement Assistance, Reducing Reimbursement Issues, Saving You Time and Effort!"

28. **ALLERGAN** cited "reimbursement" as the "#1 reason limiting M.D. BOTOX use." **ALLERGAN** increased its reimbursement services to drive off-label sales.

**B. ALLERGAN Lobbied Healthcare Payers to Expand Coverage for Off-Label Uses.**

29. Notwithstanding the lack of scientific support for headache or pain, **ALLERGAN** initiated a carefully orchestrated campaign to: (1) expand BOTOX coverage for off-label uses, and (2) eliminate any payer-imposed limitation on the amount of BOTOX injected into patients (i.e., "dosing caps"). **ALLERGAN** recruited and used physician "advocates" to lobby Medicare and Medicaid decision-makers to expand coverage for off-label uses.

30. **ALLERGAN** also funded and controlled a patient advocacy group, an organization whose mission is to expand patient access to BOTOX. Doctors were paid $1,000 each to attend the patient advocacy group's regional workshops where **ALLERGAN** reimbursement personnel coached them how to successfully lobby healthcare payers to cover off-label uses of BOTOX.

**C. ALLERGAN Directed Physician Training, Workshops, and Dinners.**

31. **ALLERGAN** funded and controlled the content of hundreds of continuing medical education ("CME") seminars, injection workshops, and promotional dinner programs at which paid speakers identified by the Company as "Key Opinion Leaders" ("KOLs") advocated BOTOX for off-label indications. For example, in 2004, a CME provider

worked with **ALLERGAN** to develop purported CME programs to address the use of BOTOX to treat pain and spasticity. **ALLERGAN** also created the Centers of Excellence as an "independent" CME to drive the use of BOTOX for headache growth. It was also a "Management Business Objective" for **ALLERGAN's** scientific services group to create, edit and control the substance of off-label CMEs, including headache.

**D. ALLERGAN Paid Doctors to Attend "Advisory Boards."**

32. **ALLERGAN** hosted numerous "Advisory Boards," purportedly designed to elicit feedback from doctors about their experience with BOTOX. These "Advisory Boards" represented another opportunity for **ALLERGAN** to promote BOTOX for off-label indications and "build loyalty and solidify important relationships." For example, in 2005, approximately 100 top-prescribing doctors attended the "**ALLERGAN** Institute of Distinction ("AIOD")," an invitation-only BOTOX marketing program held at **ALLERGAN's** corporate headquarters and the Balboa Bay Club and Resort in Newport Beach. Doctors attending the AIOD provided no consulting services, but were paid $1,500 to listen to off-label marketing presentations.

**E. ALLERGAN Created and Funded Organizations to Promote BOTOX for Off-Label Uses.**

33. In addition to the patient advocacy organization, **ALLERGAN** created and funded a purportedly independent organization,

an on-line neurotoxin education organization to "stimulate increased use of BOTOX." The Mission Statement for this on-line neurotoxin education organization was to "validate and disseminate consistent information regarding the expanding uses of BOTOX." While this on-line neurotoxin education organization purported to be an independent, third-party organization, **ALLERGAN** admitted its control over the organization, stating that "they act under our direction in creating the content and setting direction." From 1999 to 2005, **ALLERGAN** gave approximately $8 million in "unrestricted" grants to this on-line neurotoxin education organization. This on-line neurotoxin education organization maintained a web site to disseminate information about off-label uses, including videos of CME programs sponsored by **ALLERGAN** and other written materials prepared by **ALLERGAN**. **ALLERGAN**'s sales representatives were specifically trained to refer doctors to the on-line neurotoxin education organization website during sales calls.

**FORFEITURE**

THE UNITED STATES FURTHER CHARGES THAT:

1. As a result of the violations of Title 21, United States Code, Sections 331 (a), 333(a)(1), and 352(f)(1) set forth in this information, defendant **ALLERGAN, INC.**, shall forfeit to the United States of America any quantities of BOTOX which between January 2000 and December 31, 2005 were misbranded when introduced into or

while in interstate commerce, or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of Title 21, United States Code, Section 331, be introduced into interstate commerce.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendant **ALLERGAN**:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, that is $25,000,000.

All pursuant to Title 21, United States Code, Sections 331, 334, and Title 28, United States Code, Section 2461(c).

All in violation of Title 21, United States Code, Sections 331(a), 333(a)(1), and 352(f)(1).

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

RANDY S. CHARTASH
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 121760

DOUGLAS W. GILFILLAN
ASSISTANT UNITED STATE ATTORNEY
Georgia Bar No. 294713

600 RICHARD B. RUSSELL BUILDING
75 SPRING STREET, S.W.
ATLANTA, GEORGIA 30303
404.581.6009
404.581.6181

JOHN W. BURKE
Trial Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044
(202) 353-2001