**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| **vs.** ) | **No.:    1:10-cr-00375-ODE** |
| ) | |
| **ALLERGAN, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

**MEMORANDUM OF DEFENDANT ALLERGAN, INC.
IN SUPPORT OF RECOMMENDED SENTENCE**

Defendant Allergan, Inc. ("Allergan" or the "Company") respectfully

submits this memorandum in support of the binding Plea Agreement recommended

by the Government and the Company pursuant to Rule 11(c)(1)(C).

Allergan was founded in 1950, and is a multi-specialty healthcare company

that develops and sells pharmaceuticals, biologics, and medical devices for eye

care, neurosciences, medical dermatology, medical aesthetics, obesity intervention,

and urologics.  As explained more fully below, Allergan has agreed to plead guilty

to the Information charging a single-count misdemeanor violation of the

misbranding provisions of the Food, Drug, and Cosmetic Act ("FDCA").  The

proposed Plea is part of a global resolution of the Government's criminal

investigation and civil claims with respect to Allergan's sales, marketing, and

promotion of the drug OnabotulinumtoxinA, which is sold directly to physicians

for therapeutic uses under the trade name Botox®.

The global resolution involves a $350 million fine and forfeiture of $25 million as substitute assets, a payment of $225 million to resolve the Government's civil claims, a five-year Corporate Integrity Agreement entered into by Allergan with the Office of Inspector General of the United States Department of Health and Human Services, and dismissal with prejudice of Allergan's declaratory judgment action filed in the District of Columbia challenging the FDA's enforcement regime on First Amendment grounds.

The Court has set October 5, 2010 for the parties to tender the binding Plea. Both the Government and the Company request that the Court consider entering the Plea at the hearing and proceeding to impose sentence at that time in light of the circumstances of this case.

## I.   INTRODUCTION

Allergan and its foreign and U.S. subsidiaries manufacture and distribute Botox®, a purified formulation of botulinum toxin, which is locally administered through injection by physicians.  Botox® is both a "drug" and a "biological product" under federal law.  While the mainstream consumer knowledge of Botox® comes from its aesthetic indication, approved under a separate product label as Botox® Cosmetic in 2002, Botox® is known in the medical community as

an important therapeutic tool.  It was first approved for medical use in the United States in 1989, and is currently approved to treat over 20 therapeutic conditions in over 80 countries around the world.  This Plea involves the therapeutic use of Botox® and not Botox® Cosmetic.

## II.   LEGAL FRAMEWORK FOR THE MISDEMEANOR MISBRANDING OFFENSE

The Information charges a misdemeanor violation of the FDCA's "misbranding" prohibition.  Although the Information in many places references "off-label marketing," that phrase is not an element of the offense and is not mentioned or defined anywhere in the FDCA or in the implementing regulations of the Food and Drug Administration ("FDA").  "Off-label marketing" is a colloquialism used by the FDA, and refers to the FDA's enforcement position that the prohibition against drug misbranding makes illegal a manufacturer's marketing of a drug to physicians for uses not approved by FDA on the drug's labeling – that is, "off-label" – even if such marketing to the doctors is truthful.

The FDCA is unique in that it allows for misdemeanor criminal liability for a drug manufacturer which misbrands any drug, notwithstanding that the defendant did not act with scienter, did not defraud or mislead, and did not cause any injury or loss.  This regulatory violation is a strict liability offense.

3

The FDCA prohibits the "introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."  21 U.S.C. § 331.  *See also* 42 U.S.C. § 262(j).  21 U.S.C. § 333(a)(1) defines as a misdemeanor any violation of Section 331, and no intent is required to violate the statute.

A drug is misbranded if its labeling fails to bear "adequate directions for use."  21 U.S.C. § 352.  The FDA has defined "adequate directions for use" in 21 C.F.R. § 201.5 as "directions under which the layman can use a drug safely and for the purposes for which it is intended."  21 C.F.R. § 201.5.  The FDA has exempted prescription drugs from needing to bear adequate directions for use by laymen, but only if the drug's labeling "bears adequate information for its use" under which "practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended."  21 C.F.R. § 201.100(c)(1).

The "intended uses" of a drug is a regulatory term of art, very broadly defined by the FDA in 21 C.F.R. § 201.128:

> The words intended uses or words of similar import . . . refer to the objective intent of the persons legally responsible for the labeling of drugs.  The intent is determined by persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives.  It may be shown by circumstances that the

article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised.  The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer.  If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the drug, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses.  But if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put.

The manufacturer is not permitted by FDA to include directions for use on the product labeling for any indications that have not been FDA-approved.  Thus, a manufacturer is guilty of a misdemeanor misbranding offense if the manufacturer introduces a drug into interstate commerce with knowledge that the drug is offered and used for any off-label indication.

There is much controversy about the constitutional limits of the Government's broad construct of the misbranding statute, especially the purported restriction on manufacturers' truthful, non-misleading communications to physicians.  Off-label use by physicians is entirely legal, commonplace, and often constitutes the standard of care for a particular indication.  Estimates of off-label usage vary, but range from 25 percent of all prescriptions to as high as 60 percent.  *See* James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed*

5

*Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71, 80 (1998).  Federal healthcare programs will pay for off-label uses that are medically accepted.  As the Government acknowledges in the Information itself, "Once a drug is approved for a particular use the FDA does not prevent doctors from prescribing the drug for uses that are different than those approved by the FDA." Info. ¶ 12.  *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).

The breadth of the Government's interpretation of the statute and differing pronouncements by FDA over the years also raise constitutional issues under the rule of lenity.  However, as part of the Plea Agreement, Allergan has agreed to waive its rights to challenge the Government's broad reading in this case.

The Information charges that Allergan violated the misbranding provisions of the FDCA as a result of the Company's marketing of Botox® off-label for spasticity, juvenile cerebral palsy, headache, and pain from 2000 through 2005. Allergan does not agree with all the lengthy factual allegations in the Information, but agrees that the Company is guilty of the strict liability misbranding offense during the timeframe charged.  The Government and Allergan are in agreement that to establish a factual basis sufficient to satisfy Rule 11(b)(3), Allergan is not required to admit to all the facts alleged in the Information.

6

## III.   PROPOSED GLOBAL CRIMINAL AND CIVIL RESOLUTION

The Plea Agreement by the Government and Allergan follows extensive negotiations over a two and a half year period of Government investigation, and is consistent with other cases in which public companies or their subsidiaries have resolved the Government's "off-label marketing" misdemeanor charges through a binding plea.  Under the Plea, Allergan agrees that it is in fact guilty of the single-count misdemeanor charge that it misbranded Botox® in violation of the FDCA. The Company would pay a criminal fine of $350,000,000 and forfeit an additional $25,000,000.  The fine is based on the alternative fines statute, 18 U.S.C. § 3571(d), which provides, *inter alia*, that if a defendant derives pecuniary gain from an offense, the defendant may be fined not more than twice the gross gain.

Allergan also has agreed to settle civil claims based upon allegations by the United States that Allergan violated the False Claims Act and other relevant statutes, and engaged in conduct that would entitle the Government to legal and equitable relief under the common law.  The civil allegations are that Allergan knowingly caused physicians to file false claims for reimbursement from Medicare, Medicaid, and other Federal healthcare programs for off-label uses of Botox®.  Allergan denies the civil allegations, but in order to resolve the criminal investigation Allergan has agreed to compromise the civil claims by paying a total

of $225 million, as follows:  $210,150,000 plus interest will be paid to the Federal

Government; and up to $14,850,000 plus interest will be paid to states that agree to

enter into a state settlement agreement with Allergan with respect to the states'

portion of Medicaid payments for Botox®.  The Government has intervened in

three civil *qui tam* cases, pending before the Honorable William S. Duffey, Jr.,

which will be dismissed as a result of the civil settlement.  The civil settlement is

dependent on the Court accepting the binding Plea Agreement.

Allergan has agreed to enter into a five-year Corporate Integrity Agreement

("CIA") with the Office of Inspector General of the Department of Health and

Human Services.  The CIA requires Allergan to maintain and enhance the

Company's comprehensive compliance program, and provides for oversight by

both a Monitor within the Office of Inspector General and an Independent Review

Organization with resources and expertise to review the compliance program's

effectiveness, pursuant to work plans approved by the Office of Inspector General.

Finally, as part of the global resolution of its criminal investigation and civil

claims, the Government required Allergan to dismiss its declaratory judgment

action pending in the United States District Court for the District of Columbia,

captioned *Allergan, Inc. v. United States, et al.*, 1:09-cv-01879 (D.D.C.).  That

lawsuit sought a ruling on First Amendment and other grounds that Allergan could

8

proactively share truthful scientific and medical information with the medical community regarding the treatment of certain forms of spasticity, which were off-label at the time the Company filed the lawsuit.  This lawsuit was the first serious constitutional challenge brought in more than a decade to the FDA's regulatory enforcement scheme.  Allergan believes the declaratory action had merit and could have provided needed clarity regarding the permissibility of truthful, non-misleading communications from drug manufacturers to physicians.  Although the Government vociferously disagreed with Allergan's legal arguments, it was unwilling to continue briefing and argument of the case, much less proceed to judgment.  The significance of the constitutional challenge was recently acknowledged by the Commissioner of the FDA, who stated that the FDA was "pleased" that the lawsuit, which "challenged the FDA's legal authority to regulate the off-label promotion of drugs," was being dismissed as part of the settlement. Allergan Settlement of $600 Million Related to Charges Concerning Botox (Sept. 1, 2010) (Federal News Service).

## IV.   OFF-LABEL USAGE OF BOTOX®

Botox® has gained widespread medical acceptance and support in medical compendia reference texts for a number of debilitating, movement-related conditions because of its mechanism of action targeting excessive muscle

contractions.  Prior to the start of the Government's investigation, Botox® was

approved in the United States for the treatment of strabismus (crossed eyes) and

blepharospasm (uncontrolled blinking) associated with dystonia, cervical dystonia

(involuntary neck muscle contractions), and severe primary axillary hyperhidrosis

(excessive sweating).  In addition to approved indications, Botox®'s broad utility

in relaxing muscles has led doctors in the United States to use Botox® to treat a

range of conditions not yet included on the product labeling.

It should be emphasized that the Information contains no allegations the

Company endangered patients, or engaged in fraudulent, misleading, or deceptive

conduct.  "[I]t is well-established that off-label marketing of an approved drug is

itself not inherently fraudulent."  *Cent. Reg'l Employees Benefit Fund v. Cephalon,

Inc.*, No. 09-3418, 2009 WL 3245485, at *4 (D.N.J. Oct. 7, 2009) (internal citation

and quotation marks omitted).  *See In re Schering-Plough Corp. Intron/Temodar

Consumer Class Action*, No. 2:06-cv-5774, 2009 WL 2043604, at *10 (D.N.J. July

10, 2009) ("[T]he off-label use of pharmaceutical products is both prevalent and is,

often times, the best means for providing effective treatment for patients.").

The greatest percentage of Botox® off-label usage had been for treatment of

adult spasticity (typically caused by stroke) and spasticity associated with juvenile

cerebral palsy.  Outside the United States, these indications have received

10

widespread regulatory approval, including in the United Kingdom, Canada, France, Germany, Italy, Australia, New Zealand, and most of the rest of the industrialized world.  In this country, the use of Botox® to treat spasticity has long been considered standard of care by the medical community.  In March 2010, the FDA approved Botox® for the treatment of adult spasticity in the upper limbs.  FDA approval for adult spasticity was based on clinical studies that Allergan conducted and published a decade ago, and the recent approval was a result of FDA on its own initiative changing the applicable evaluation criteria.

Although Botox® is not yet approved to treat spasticity associated with juvenile cerebral palsy, the FDA has made clear that it does not want to discourage use of Botox® for that indication.  In April 2009, when the FDA announced additional warnings for all botulinum toxin products, a senior FDA official stated at a press conference that such treatment for juvenile spasticity was "not approved by the FDA but it's still an important medical use . . . .  [T]hese are patients who have . . . significant disabilities because of spasticity.  And these products offer . . . a very effective means to relieve a very important problem and they're commonly used.  And we do not mean in any way to discourage that kind of use."  FDA News, Transcript: FDA Media Briefing on Botulinum Toxin Products (April 30, 2009).  Allergan is currently in discussions with the FDA regarding clinical

development for juvenile cerebral palsy.

Over the past ten years, Allergan has expended substantial resources studying the treatment of severe headaches with Botox® injections. Following investigational clinical trials, called Phase II clinical studies, FDA permitted Allergan to proceed to large-scale patient clinical trials, or Phase III studies, for the prophylactic treatment of headache in adults suffering from chronic migraine. In September 2008, Allergan announced positive results from the Phase III trials and has since filed for FDA approval for chronic migraine. Allergan expects the FDA to rule on its application in 2010.

Finally, Botox® is FDA-approved to treat "neck pain associated with cervical dystonia," but it is not approved to treat pain more generally. Nevertheless, physicians have also utilized Botox® to treat pain. In 2008, the American Academy of Neurology concluded, based on past studies, that botulinum toxin "is possibly effective for the treatment of chronic predominantly unilateral L[ower] B[ack] P[ain]," and "may be considered as a treatment option" for that indication. M. Naumann et al., *Assessment: Botulinum neurotoxin in the treatment of autonomic disorders and pain (an evidence-based review)*, 70 Neurology 1707, 1710 (2008). *See also* Catalina Apostol et al., "Botulinum Toxins for the Treatment of Pain," in *Current Therapy in Pain*, 489, 489 (Saunders Elsevier 1st

12

ed. 2009) ("Major uses of BTXs [botulinum toxins] for painful conditions include headache, low back pain, and painful myofascial and muscle disorders.").

## V.    RECOMMENDED SENTENCE

### A.    Fine

#### 1.    Fine Amount

Under 18 U.S.C. § 3571(d), "the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss, unless imposition of a fine under this subsection would unduly complicate or prolong the sentencing process." The gain or loss must be caused by the offense of which the defendant is guilty. *See United States v. BP Prods. N. Am.*, 610 F. Supp. 2d 655, 686-89 (S.D. Tex. 2009).

The Sentencing Guidelines for organizations do not apply for purposes of determining the fine for a misdemeanor misbranding violation.[1]  Allergan and the Government have agreed to use gross gain to the Company as the relevant measure to calculate the fine amount.  The parties considered the amount of pretax profit from sales of Botox® in the United States for spasticity, juvenile cerebral palsy,

---

[1] The "Offense Conduct" section for a FDCA misdemeanor misbranding violation is found at Section 2N2.1 of the Guidelines.  That section is not included in the list of offenses at Section 8C2.1 for which the fines are calculated for organizations.

headache, and pain, as well as certain "organic growth" rates, or percentages of

sales the parties could agree were not caused by Allergan's activities.  The issue of

"organic growth" is extremely complex and subject to differing interpretations.

Allergan believes that much higher organic growth rates should apply because of

the extensive support in the medical community for off-label usage of Botox®,

widespread coverage by Government insurers like Medicare and Medicaid for

Botox® off-label treatments, and the predominant role that a physician's

independent clinical judgment plays in deciding to treat patient illness with

Botox®.  However, in an effort to reach a global resolution, Allergan and the

Government utilized lower organic growth rate assumptions for purposes of

negotiations.  Allergan and the Government ultimately agreed to a fine of $350

million and forfeiture of an additional $25 million.

> **2.      The Court's Consideration of the Recommended Sentence
> Should Take Into Account The Company's Substantial
> Compliance Efforts Over Time**

The Government's sentencing memorandum contends that off-label

marketing occurred after the Information's 2000-2005 timeframe.  Allergan

disagrees, and believes it is unfair for the Department of Justice to file a lengthy

narrative of uncharged, unproven, and argumentative contentions when the

Government already has agreed to a recommended sentence, and the misdemeanor

14

Information covers a specific time period.  However, it is not necessary for the

Court to resolve this disagreement in light of the elements of the offense and the

Company's admission that it is guilty of misbranding during the timeframe

charged.  Further, resolution of such factual disputes would require substantial

expenditure of Court resources, as the issues are complex (for example, the

Government's commentary about efforts to grow on-label sales for cervical

dystonia ignores the substantial literature that cervical dystonia is under-diagnosed

and often misdiagnosed, and that headache and pain are leading symptoms).

What is undisputed is that Allergan has strengthened its compliance program

over time, and Allergan respectfully requests that the Court take into account the

Company's significant compliance efforts during the timeframe of the charge as

well as compliance enhancements in the more recent years.

### a.      Overview Of Compliance Activities 1997-2005

Allergan promulgated written standards and procedures regarding key FDA

and healthcare compliance risks as early as 1997 when it issued the "Principles

Concerning Off-Labeled Uses of Botox®," which explicitly prohibited "the

improper dissemination of off-labeled use information concerning Botox®."  At

least since 1997, the Company's strategic planning consistently and properly has

contemplated growth in Botox® off-label indications resulting from new FDA

approvals, and Allergan has invested heavily in clinical trials of Botox®.

In January 1998, Allergan's CEO distributed to all employees a comprehensive Code of Ethics that was approved by Allergan's Board of Directors.  During this period, Allergan also instituted a compliance hotline ("EthicsHelp").  Allergan continued to update and disseminate comprehensive written policy manuals throughout the period covered by the Plea, focusing its compliance efforts on emerging risk areas.

In 2002, Allergan issued a "Field Reference Guide," which flatly prohibited the promotion of "any Company product for uses that are not addressed in the approved product labeling or package insert."  The Company also adopted and distributed to all sales and marketing personnel the Code on Interactions with Healthcare Professionals promulgated by the leading industry organization, the Pharmaceutical Research and Manufacturers of America.

In January 2003, the Allergan Field Reference Guide was updated to prohibit sales representatives from making joints calls on healthcare providers with medical scientific liaisons.  By April 2003, sales representatives also were prohibited from being present with reimbursement personnel during any off-label discussion with a healthcare provider.

In June 2003, Allergan issued a comprehensive "Best Practices Guide" that

was specific to the activities of the Company's medical scientific liaisons. The Guide was explicit that the medical scientific team "does not engage in soliciting or promoting 'off-label'" and "[t]here will be no joint calls with sales for this activity."

In many instances, the compliance policies and controls adopted by Allergan exceeded industry standards. For example, effective January 2004, Allergan changed its compensation plan so that the sales representatives' compensation was not primarily based on their own territory sales, which would have included both on and off-label sales to physicians. In July 2004, even though FDA pronouncements permitted sales representatives to respond to off-label questions from physicians, Allergan took the significant step of prohibiting its sales personnel from responding to such questions regarding off-label uses of Botox®. Instead, sales representatives were required to refer all such questions to appropriate medical scientific liaisons or reimbursement personnel.

In June 2005, to formalize the separation of its promotional and medical scientific activities, Allergan's Global Medical Affairs department was created to serve as the interface regarding medical information. At the same time, a Grant Review Committee was created to exercise control over the grant review process for medical education. The Committee included members of the medical

17

scientific, legal, and regulatory departments.

  **b.**  **Overview Of Compliance Enhancements 2006-Present**

  By the Fall of 2005, in light of the Company's rapid growth in personnel, Allergan recognized the need to consolidate its compliance policies in a comprehensive manual.  Allergan recruited an additional compliance counsel with primary responsibility for developing and promulgating that manual.

That attorney worked diligently to develop Allergan's comprehensive Healthcare Law Compliance Program Manual, which was rolled out in the Fall of 2006.  The Compliance Program Manual, which Allergan continues to update regularly, contains 22 detailed compliance sections addressing all of the risk areas identified in the Department of Health and Human Services Office of Inspector General's 2003 Compliance Program Guidance for Pharmaceutical Companies, as well as other agency and industry guidance.  68 Fed. Reg. 23731, 23731-43 (May 5, 2003).

  In conjunction with the implementation of the Compliance Program Manual, Allergan moved the administration of its grant review process completely away from the commercial organization, and in 2007, the Medical Education department was created within Global Medical Affairs to oversee grant requests.

  There are now 12 full-time employees in the Compliance Department.

18

These individuals report to a Chief Compliance Officer who reports directly to the

Chief Executive Officer, and oversight of the program is provided by a Corporate

Compliance Committee and the Board of Directors.

Allergan's investment in compliance has included major technology projects

designed to embed compliance in everyday business practices.  Allergan developed

and implemented an automated electronic compliance tool called the Business

Execution Automated Compliance Navigator ("BEACON").  BEACON embeds

compliance controls at virtually every step of key business processes.  BEACON

fosters compliance through up-front controls such as spending caps and approval

requirements for speaker programs, advisory boards, engagement of healthcare

professionals, and expenditures on meals and educational items.  It also provides

real-time monitoring and facilitates more frequent and effective compliance

auditing, and it has built-in "red flags" and "hard stops" to prevent approval when

a compliance limit is exceeded.  The total cost to purchase, test, and implement

BEACON is estimated at $9.3 million.

**B.     In Light Of Allergan's Compliance Program And The Corporate
Integrity Agreement With The Office Of Inspector General, It Is
Not Necessary For The Court To Impose Probation**

The Government and Allergan recommend that the Court not order

probation in this case.  Under the Sentencing Guidelines, a primary focus of

placing an organization on probation is to remedy the absence of an existing and

effective compliance program, and to provide for monitoring and reporting on the

organization's compliance efforts to the Court or a probation officer.  U.S.S.G. §§

8D1.1(a)(3) and 8D1.4(c).  The Company's existing compliance program

described above fully meets the criteria for an effective program.

In addition, Allergan has entered into a five-year Corporate Integrity

Agreement with the Office of Inspector General at the Department of Health and

Human Services, the terms of which require extensive independent supervision

over Allergan, and exhaustive reporting on compliance issues both to the Office of

Inspector General and a separate Independent Review Organization.

Under the CIA, Allergan is required to submit initial and annual reports to a

Monitor from the Office of Inspector General that include information related to:

certification of compliance with regulatory requirements; the Company's Code of

Conduct; policies and procedures required by the CIA; Company training;

Independent Review Organization independence and objectivity; disclosure of

payments to third parties; Allergan's screening process for identifying persons who

have been declared ineligible to participate in Federal healthcare programs;

required communications with healthcare providers; any changes to the compliance

policies and procedures; and ongoing monitoring and auditing.  Finally, Allergan is

required to report to the Monitor any probable violation of Federal healthcare laws that is detected through required auditing and monitoring.

The CIA additionally mandates the engagement of an Independent Review Organization to conduct periodic reviews of Allergan's systems, processes, policies, procedures, and records. The reviews include evaluation of the following areas: inquiries about product uses, including off-label uses; medical personnel interactions with healthcare professionals and institutions; internal review and approval of information sent to healthcare professionals and institutions; incentive compensation; call plans; speaker arrangements; other consultant or fee-for-service arrangements with healthcare professionals and institutions; submission of information to medical compendia; investigator-initiated clinical trials; publications; reimbursement support services; Allergan's responses to requests for information received from healthcare providers; sales force call plans; and payments to physicians.

The CIA also provides for Board oversight, and requires extensive employee training, monitoring, and auditing of numerous specific aspects of the Company's sales, marketing, medical information, and reimbursement functions. Allergan is also required to disclose on the Company's public website all payments to physicians and related entities, and grants to medical education organizations.

21

**C.     An Order Of Restitution Is Not Warranted And Would Unduly Complicate And Prolong The Sentencing**

The Government and Allergan recommend that the Court not order restitution.  Under the civil settlement, the Government will be made whole for any damages incurred.

With regard to private parties, the misdemeanor misbranding violations are not listed as offenses for which restitution may be ordered pursuant to the Victim and Witness Protection Act or the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663 and 3663A.  While restitution may be ordered as a condition of probation pursuant to 18 U.S.C. § 3563(b)(2), the Sentencing Guidelines do not recommend restitution as a term of probation (or supervised release) where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." U.S.S.G. § 8B1.1(b)(2).  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3).

The only appropriate recipients of criminal restitution are victims who directly and proximately suffered loss as a result of the conduct underlying the defendant's conviction.  *See United States v. Robertson*, 493 F.3d 1322, 1334 (11th

Cir. 2007); 18 U.S.C. § 3663(a)(2); 18 U.S.C. § 3663A(a)(2); *United States v. Romines*, 204 F.3d 1067, 1069 (11th Cir. 2000) (same limitations on "victims" who may be awarded restitution under statute apply "to orders as conditions of probation and supervised release").

The Information does not allege false or misleading conduct toward private insurers, nor harm to patients.  Establishing any monetary harm to such private parties – which Allergan denies – would involve the Court determining an enormous volume of complex, individualized facts.  The decision to treat a particular patient with Botox® is made by a physician who takes into account a myriad of factors based on the physician's training and experience, and the patient's medical history.  *See United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007) (in off-label case involving felony charges under the FDCA, declining to order restitution because "the restitution process would unduly complicate and prolong the sentencing process.  In order to prove causation, litigation over many months, if not years, would be required before final judgment in this case could be entered.").  *See also UFCW Local 1776 and Participating Employers Health & Welfare Fund v. Eli Lilly and Co.*, No. 09-0222-cv, 2010 WL 3516183, at *13 (2d Cir. Sept. 10, 2010) (reversing class certification in case involving off-label marketing alleged to be fraudulent, in part because plaintiffs'

"theory of causation is interrupted by the independent actions of prescribing physicians, which thwarts any attempt to show proximate cause through generalized proof").

In a restitution hearing, Allergan would establish that physician medical decisions were not based on Allergan's marketing, but on far more persuasive factors such as discussions with colleagues, investigational studies, medical journal articles, patient interest, the availability of insurance reimbursement for Botox® off-label treatments, and the physicians' clinical judgment when they made the decision to use Botox® to treat individual patients.

_____

For the reasons set forth above, Allergan requests that the Court accept the binding plea and proceed to imposition of the recommended sentence.

Respectfully submitted this 4th day of October, 2010.

King & Spalding LLP

s/ Stephen S. Cowen
Georgia Bar Number: 192175
scowen@kslaw.com
Phyllis B. Sumner
Georgia Bar Number: 692165
psumner@kslaw.com
Matthew H. Baughman
Georgia Bar Number: 042793
mbaughman@kslaw.com
Victoria M. Calvert
Georgia Bar Number: 636029
vcalvert@kslaw.com
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4600
Fax: (404) 572-5100

Of Counsel:
John T. Bentivoglio (*pro hac vice*)
Skadden, Arps, Slate, Meagher
    & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 371-7560
Fax: (202) 661-2360

Attorneys for Allergan, Inc.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this pleading has been prepared in compliance with Local Rule 5.1C.

s/ Matthew H. Baughman
Georgia Bar Number: 042793
Attorney for Allergan, Inc.
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4751
Fax: (404) 572-5141
Email: mbaughman@kslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing

**MEMORANDUM OF DEFENDANT ALLERGAN, INC. IN SUPPORT OF**

**RECOMMENDED SENTENCE** was filed with the Clerk of Court using the

CM/ECF system which will automatically send email notification of such filing to

the following attorneys of record:

Randy S. Chartash
Randy.chartash@usdoj.gov
Chief, Economic Crimes Section
United States Attorney's Office
Northern District of Georgia
Suite 600, 75 Spring Street, S.W.
Atlanta, Georgia 30303

Douglas W. Gilfillan
Doug.gilfillan@usdoj.gov
Assistant U.S. Attorney
United States Attorney's Office
Northern District of Georgia
Suite 600, 75 Spring Street, S.W.
Atlanta, Georgia 30303

Dahil D. Goss
Dahil.goss@usdoj.gov
Assistant U.S. Attorney
United States Attorney's Office
Northern District of Georgia
Suite 600, 75 Spring Street, S.W.
Atlanta, Georgia 30303

John W. Burke
Attorney, Office of Consumer Litigation
Civil Division
United States Department of Justice
P.O. Box 386
Washington, D.C. 20044


This 4th day of October, 2010.

s/ Matthew H. Baughman
Georgia Bar Number: 042793
Attorney for Allergan, Inc.
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, Georgia 30309-3521
Telephone: (404) 572-4751
Fax: (404) 572-5141
Email: mbaughman@kslaw.com